# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA LEANNE CLAUSEN,<br><br>       Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>       Defendant. | Case No. 1:17-cv-01484-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 15, 22, 23) |

## I.

## INTRODUCTION

Plaintiff Lisa Leanne Clausen ("Plaintiff") filed a complaint on November 3, 2017, seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. (ECF No. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from fibromyalgia, asthma, obesity, and chronic sinusitis. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on October 3, 2013. (AR 161-68.) Plaintiff's application was initially denied on March 24, 2014, and denied upon reconsideration on June 10, 2014. (AR 65-77, 78-93.) Plaintiff

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 7, 9.)

requested and received a hearing before Administrative Law Judge Cynthia Floyd (the "ALJ"). (AR 110-119, 125-150.) Plaintiff appeared for the hearing on March 23, 2016. (AR 35-64.) On April 27, 2016, the ALJ found that Plaintiff was not disabled. (AR 18-34.) On August 7, 2017, the Appeals Council denied Plaintiff's request for review. (AR 1-6.) On November 3, 2017, Plaintiff filed a complaint in this Court seeking judicial review of Defendant's final decision denying her application for disability benefits. (ECF No. 1.) On July 6, 2018, Plaintiff filed her opening brief. (ECF No. 15.) Following multiple extensions of time, Defendant filed a brief in opposition on September 12, 2018. (ECF No. 22.) Plaintiff filed her reply brief on September 17, 2018. (ECF No. 23.)

**A.     Relevant Hearing Testimony**

Plaintiff appeared with counsel and testified at a March 23, 2016 hearing before the ALJ. (AR 35-64.)

1.     The ALJ's Examination of the Plaintiff

Plaintiff was thirty-four years old, 5' 7" tall, and weighed 240 pounds on the date of the hearing. (AR 38-39.) Plaintiff clarified her normal weight is 230 pounds. (AR 39-40.) She lives in a single-story house with her husband, four children aged ten through fifteen years old (two biological and two step-children), and four cats. (AR 39.) She is right handed. (AR 40.)

Plaintiff does not have a college degree, but obtained vocational certificates to be a paramedic in 2008, an EMT in 2000, and also obtained a certificate for phlebotomy but did not specify a date. (AR 42-43.)

She previously received workers' compensation payments in 2008 or 2009 following a leg injury working for American Ambulance. (AR 40.) She worked for Target, and Tribal Council, following that time. (AR 40.) She previously received state disability payments when she was pregnant, and also in early 2012 after a doctor put her on stress leave from the Tribal Council. (AR 40-41.) Plaintiff stated the doctor took her off work because her "anxiety and stuff was overwhelming . . . was a lot of stuff going on at work and that was the last time [she] worked." (AR 41.) When asked what was happening that was so stressful and causing anxiety, Plaintiff stated there was a lot of corruption at the tribal reservation that she wasn't okay with

going along with, and specifically, she wasn't willing to falsify documents, which led to her to allegedly being held by the police with pressure to falsify the documents, and she did not return to the position. (AR 41.)

She has not worked since January of 2012. (AR 43.) Her last position was with the Tool Rebel Tribal Council, working as an EMT for the police department. (AR 43.) In such position she would have to move people, and therefore required being able to lift more than one hundred pounds. (AR 43.) Between 2007 and 2010 she worked for American Ambulance as an EMT, while finishing her paramedic certification. (AR 44.) She was injured right after she obtained the paramedic certificate, so she was never able to become a paramedic through the state board. (AR 44.) In 2001, Plaintiff worked for Smith Care as a certified nurse's assistant. (AR 44.) She previously worked for Delano Ambulance Service as an EMT. (AR 45.) She has only applied to one job since 2012, after complaints from her husband. (AR 45.)

Plaintiff testified that the main thing preventing her from working is chronic pain, mostly in the back and neck, which take turns being the worst depending on the day. (AR 45.) She gets massages, and when she has money, sees a chiropractor. (AR 46.) She takes tramadol four times a day, which helps ease back and neck pain just enough where she doesn't "cry," but doesn't help very much. (AR 46.) She takes the muscle relaxer Flexeril once or twice a day, which helps a little bit, but not much. (AR 46.) She has been taking Savella for a few months. (AR 46.) Savella is a long-term chronic pain medication and she hasn't noticed much of a difference, so she doesn't know yet if it is very beneficial but the doctors told her to keep trying. (AR 46-47.) To help with her stress level, Plaintiff takes anti-depressants. (AR 46.)

On a bad day, Plaintiff can only walk a few blocks, and probably a mile on a not so bad day, however if she does walk a lot one day, she will be in bed the next day. (AR 47.) She has at least one or two bad days a week where she is unable to get out of bed at all. (AR 47.) She says she is lucky to have one or two days a week where she is really able to do anything at all. (AR 47.) It depends on the day whether she will stay in bed or on the couch, or if she is able to make her own meals, and sometimes she just doesn't do anything or sleeps all day. (AR 47.)

Plaintiff has a driver's license, and the amount of driving she does depends on whether

her husband is home.  (AR 41-42.)  If her husband is home, she doesn't really drive at all.  (AR 42.)  If he is not home, she usually just drives her kids to school and back, and if she goes grocery shopping, it is only a mile away.  (AR 42.)  She does not take the kids to activities, as they really don't have activities outside of the home.  (AR 42.)  She walks to a home church for bible study once a week which is located five houses away.  (AR 42.)

On a good day, Plaintiff gets up at 6:00 a.m. to wake her kids up for school, then goes back to bed until 7:00 a.m., then drives her daughter to school, then returns to take the rest of the children to school, and then she usually goes back to bed until about 9:00 or 10:00 a.m.  (AR 47.)  She then works on chores that she hasn't had a chance to do in a long time.  (AR 47.)  Every family member does their own laundry, so Plaintiff will do her own laundry.  (AR 48.)  She will do dishes if her husband left any, but he is pretty good at doing that.  (AR 48.)  She will do things such as taking care of the cats, or cleaning up, but she doesn't "do much around the house."  (AR 48.)

If she needs to go to the grocery store, she usually takes a friend with her to help with anything too heavy or to help push the cart if needed, because she knows that it will hurt her back, so she avoids doing so.  (AR 48.)  Upon returning from the grocery store, she unloads the items, and then, depending on how long she was gone, will just sit and watch a lot of television.  (AR 48.)

Plaintiff states that if she must, she can pick up heavy items, weighing thirty to forty pounds, but chooses not to because she knows it will make her back spasm, and won't do so unless an emergency.  (AR 48.)  She can probably only lift a few pounds once without causing back pain, but if there is any repetition, even with a small weight, her back will eventually start hurting.  (AR 48.)

Plaintiff experiences brain fog that impedes her concentration.  (AR 48.)  If she is doing something such as working on bills with her husband, she will only be able to concentrate for twenty to thirty minutes and then has to stop because she will start making mistakes because her brain doesn't work well after that point.  (AR 48-49.)

As far as hobbies, Plaintiff likes to make little crafts, though not very often, last sewing a

purse three or four months prior, taking about fifteen minutes to do so.  (AR 49.)  She mainly watches television, probably more than six hours a day, and mainly while in bed.  (AR 49.)

### 2. Examination of Plaintiff by Counsel

The Plaintiff was then examined by her counsel.  (AR 50.)  Plaintiff lays in bed most of the day because it is more comfortable than sitting up, and she experiences less pain.  (AR 50-51.)  On a not so bad day, Plaintiff will usually take two naps, while on a bad day, she usually sleeps until 2:00 or 3:00 in the afternoon, then gets up for a little while, then after dinner goes to bed around 6:00 p.m. and sleeps to the next day.  (AR 51.)  She feels better after the naps.  (AR 51.)

Medications that Plaintiff previously tried include Lyrica, gabapentin, Norco, Nucynta, and many that she doesn't recall.  (AR 51.)  Of those medications, Norco did help for pain better than her current medications, however she developed an allergy and could not take them any longer.  (AR 51-52.)  On a not so bad day, Plaintiff's pain is usually around a six or seven on scale of one to ten, and tramadol usually takes the pain down to a five, or a four if a really good day.  (AR 52.)  On a bad day, Plaintiff's pain is around a level ten, and sometimes medication doesn't help when very bad, but if it helps, takes it down to about a level eight.  (AR 52.)

Plaintiff was initially treated for fibromyalgia in 2008, and has gotten worse since that time.  (AR 52.)  In regards to testing such as x-rays and MRIs, Plaintiff confirmed that to her knowledge, there is nothing "structurally" wrong with her neck, back, hips, or knees.  (AR 52-53.)

Plaintiff's counsel asked her how fibromyalgia impacted her in 2008, as she was still working at that time.  (AR 53.)  Doctors could not initially determine Plaintiff's pain was caused by fibromyalgia, and Plaintiff stated the pain "kind of subsided and it was just kind of something there in the background and I tolerated.  I just tolerated it and just as the years have gone, the symptoms have gotten worse."  (AR 53.)  She used to only use prescribed pain medication for bad days, but then it turned into every day, continually getting worse, particularly the last two years.  (AR 53.)

Plaintiff's husband helps by taking care of the kids and cooking most of the dinners, and

Plaintiff rarely cooks. (AR 53.) Plaintiff's husband does the dishes, and since the children are older now, the kids are able to do a lot of the housework, and her husband helps with what they don't do. (AR 53.) At the time of the hearing, her husband, a correctional officer, was off on workers' compensation due to an assault by an inmate, however when working, he typically comes home at 2:45 in the afternoon. (AR 53-54.)

On bad days, Plaintiff doesn't prepare meals for herself, and usually doesn't even eat, or maybe has fruit or a granola bar, due to feeling really nauseous from the pain. (AR 54.) On good days, Plaintiff does things such as straightening up "junk piles because [her] husband likes to pile the mail in four different spots," sometimes washes dishes left in the sink, or sometimes cooks dinner because her husband likes her cooking. (AR 54.)

Plaintiff still experiences anxiety, and takes Xanax when she experiences a panic attack, which she experiences almost every day because of how stressful her life is. (AR 55.) The Xanax does work to stop bad panic attacks while happening, and she uses it at least once a day. (AR 55.)

Plaintiff visits with friends about twice a week, usually to sit around and talk, or sometimes to go to lunch. (AR 55.) When asked hypothetically if she could work an eight-hour day if she had no bad days, Plaintiff replied that even if the pain were gone, she would still have the issues with concentration, so no. (AR 56.)

### B.    ALJ Findings

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2016.

- Plaintiff has not engaged in substantial gainful activity since January 16, 2012, the alleged onset date.

- Plaintiff has the following severe impairments: fibromyalgia, asthma, obesity, and chronic sinusitis, right.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform medium work except she can lift and carry 50 pounds occasionally, 25 pounds frequently, stand and walk for 6 hours cumulatively in an 8-hour workday with normal breaks, and sit for 6 hours in an 8-hour workday with normal breaks. She can never climb ladders, ropes, or scaffolds; must avoid concentrated exposure to extreme temperatures (i.e., heat and cold); must avoid concentrated exposure to workplace hazards (i.e., unprotected heights, fast moving unprotected machinery, traversing uneven or slippery terrain); and must avoid even moderate exposure to fumes, odors, dust, gases, poor ventilation, and wetness.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on April 30, 1981, and was thirty years old, which is defined as younger individual age 18-49, on the alleged disability onset date.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is not disabled, whether or not Plaintiff has transferable job skills.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from January 16, 2012, through the date of the ALJ's decision, April 27, 2016.

(AR 21-30.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step

sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means "more than a scintilla . . . but less than a preponderance." Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm

simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006) (internal quotations and citations omitted). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

**IV.**

**DISCUSSION AND ANALYSIS**

A.     **The ALJ Properly Gave Reduced Weight to Treating Physician Dr. Sidhu's Opinion**

On October 15, 2015, treating physician, Jaisimaran Sidhu, M.D., completed a fibromyalgia medical source statement. (AR 502-506.) Dr. Sidhu found that Plaintiff did not meet the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia, which includes tender point criteria, however did find that she met the 2010 ACR Preliminary Diagnostic Criteria for Fibromyalgia, which does not include tender point criteria. (AR 502.) Dr. Sidhu also diagnosed vitamin D deficiency, asthma, and polycystic ovary syndrome. (AR 503.) Dr. Sidhu confirmed that other disorders which may cause the symptoms were excluded. (AR 503.) It appears that Dr. Sidhu identified eight out of the eighteen fibromyalgia tender points. (AR 504.)

Dr. Sidhu opined the following functional limitations affecting Plaintiff: 1) she does not have the stamina or endurance to work an easy job eight hours per day, five days a week, with normal breaks every two hours; 2) she needs to take an hour nap every two to four hours; 3) she can only focus two hours in an eight-hour day on tasks using the brain; 4) she needs a job that permits shifting position at will from sitting, standing or walking; 5) she needs to allow ten minute walks every thirty minutes during an eight-hour day; 6) she needs to take ten minute unscheduled breaks every thirty minutes due to pain, fatigue, and brain fog; 7) she has limitations with reaching, handling, and fingering, limiting use during a workday to only 10% for bilateral hands and fingers, and 25% for bilateral arms reaching in front and overhead; and 8) she

would likely be off task 25% or more of a typical day due to symptoms interfering with attention and concentration to perform even simple tasks. (AR 504-506.) Dr. Sidhu also found that Plaintiff is capable of performing low stress work, however her impairments are likely to produce bad days which result in more than four absences from work a month. (AR 506.)

The ALJ found Dr. Sidhu's medical opinion was entitled to little weight:

> The undersigned gives Dr. Sidhu's opinion little weight because there is insufficient clinical data, lab findings, and diagnostic studies to support it. Additionally, the claimant's course of treatment was conservative and Dr. Sidhu's opinion is inconsistent with the other opinions. Furthermore, it appears that Dr. Sidhu relied primarily on the claimant's subjective complaints, given the limited objective findings [citing AR 370-397, 398-414, 465-484, 559-564]. His opinion is also inconsistent with the claimant's reported activities of daily living which demonstrated a far greater residual functional capacity. Furthermore, Dr. Sidhu's opinion relative to the claimant's limited ability to use her brain is inapposite to the clinical data gathered by the consultative psychological examiner who noted that she presented with normal concentration, full orientation, average intelligence, normal memory, no hallucinations or delusions, and no suicidal ideations.

(AR 28.)

Plaintiff raises multiple arguments regarding the ALJ's rejection of Dr. Sidhu's opinion: 1) it was improper to assign reduced weight to the opinion for being unsupported by the objective evidence and relying too much on subjective symptoms; 2) it was improper to assign reduced weight to the opinion because Plaintiff's course of treatment was too conservative; 3) it was improper to assign reduced weight because of the conflicting opinions of doctors Rios, Jacobs, and Ocrant; 4) it was improper to assign reduced weight to Dr. Sidhu's opinion for being inconsistent with Plaintiff's reported daily activities; and 5) it was improper to assign reduced weight to Dr. Sidhu's opinion for being inapposite to the clinical data gathered by the consultative psychological examiner. (Pl.'s Opening Br. ("Pl. Br.") 7-14, ECF No. 15.)[2]

The Court addresses each of Plaintiff's challenges in turn.

///

///

///

---

[2] Except for citations to the Administrative Record, references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

1.     **The ALJ Must Provide Specific and Legitimate Reasons to Assign Reduced Weight to a Treating Physician's Opinion that is Contradicted by other Opinions**

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). In general, a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted). If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record. Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005)).

Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict. Andrews, 53 F.3d at 1041. However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record. Andrews, 53 F.3d at 1041.

The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).

Here, Plaintiff's treating physician opinions are contradicted by the opinions of Dr. Ocrant, Dr. Jacobs, Dr. Rios, and Dr. Hirokawa. Therefore, the ALJ needed to provide specific and legitimate reasons that are supported by substantial evidence in the record to reject the treating physician's opinion.

2.    The ALJ Properly Gave Reduced Weight to Dr. Sidhu's Opinion Based on Insufficient Objective Medical Data and Reliance on Plaintiff's Subjective Symptoms

The ALJ gave Dr. Sidhu's opinion little weight because of insufficient clinical data, lab findings, and diagnostic studies to support it, and because the ALJ found Dr. Sidhu relied primarily on the Plaintiff's subjective complaints, given the limited objective findings. (AR 28, citing AR 370-397, 398-414, 465-484, 559-564.)

Plaintiff emphasizes that fibromyalgia is diagnosed based on the patient's allegations of pain and symptoms, no laboratory tests are available to confirm the diagnosis, and once diagnosed, the ALJ's analysis should consider "a longitudinal record whenever possible." (Pl. Br. at 8-9, citing Revels v. Berryhill, 874 F.3d 648, 656 (9th Cir. 2017); SSR 12-2p.) In this regard, Plaintiff argues she has "demonstrated ongoing fibromyalgia symptoms to her doctors over a period of time," including: migraines in January of 2014 (AR 376-77), presenting with 11 of 18 fibromyalgia tender points in April of 2014 (AR 473), neck and back pain in December of 2014 (AR 521), hip pain with no known injury in March off 2015 (AR 517), neck pain, nausea, and dizziness in August of 2015 after receiving a pain shot in emergency room the night before (AR 514), fatigue and insomnia in September of 2015 (AR 513), burning nausea, and fatigue in October of 2015 (AR 512), and a fibromyalgia flare which lasted three months around February 2016 with reported pain in the back, right buttock, right arm, and right hand (AR 508). Plaintiff contends that Dr. Sidhu's opinion takes into consideration the longitudinal history of symptoms, which continue to present despite ongoing use of various strong medications, and therefore his opinion was improperly rejected by the ALJ. (Pl. Br. at 12.)

Defendant argues that Plaintiff routinely denied musculoskeletal joint pain to other doctors, including Doctors Tanus and Boren (AR 296, 466, 469, 472, 475, 479, 482, 573), that treatment exams consistently resulted in normal musculoskeletal findings (AR 296, 304, 310, 313, 316, 466, 467, 470, 473, 476, 480, 483, 576), and denied fatigue to Dr. Tanus and Boren between November 2012 and November 2014 (AR 295, 303, 309, 315, 469, 491, 492). (Def.'s Opp'n Pl.'s Opening Br. ("Def. Opp'n") 12, ECF No. 23.) Despite Plaintiff arguing the

1  longitudinal record supports her claim, Defendant points out that Plaintiff's summary of the
2  medical evidence in her opening brief begins in 2014, more than two years after the alleged onset
3  date. (Def. Opp'n at 13.)

4      When an ALJ believes a physician's opinion is unsupported by the evidence, the ALJ has
5  a burden to "set[ ] out a detailed and thorough summary of the facts and conflicting clinical
6  evidence, stat[e] his interpretation thereof, and mak[e] findings." Cotton v. Bowen, 799 F.2d
7  1403, 1408 (9th Cir. 1986).

8      The ALJ evaluated and found that the physical examination records were "generally
9  normal with minimal abnormalities," and "showed normal range of motion, strength, and tone."
10 (AR 26, citing AR 370-397, 465-484.) The ALJ noted there were "intact cranial nerves, . . .
11 normal strength, sensory, and reflexes," as well as intact gait and coordination. (AR 26.) The
12 ALJ also noted that Plaintiff did show tender points 11 of 18 throughout her body. (AR 26,
13 citing AR 465-484.) The ALJ evaluated and found the x-rays in the record to be largely normal
14 and unremarkable, aside from a moderate to severe muscle spasm observed in an August 6, 2015
15 cervical spine x-ray, and an x-ray of the bilateral hips which showed minimal narrowing of the
16 hip joints bilaterally, on April 16, 2015. (AR 26, 398-414, 559, 560, 564.)

17     The ALJ evaluated the opinions from consultative psychological examiners Drs. Aquino-
18 Caro, and Murrilo. (AR 24.) These consultative psychological examiners found that Plaintiff
19 did not suffer from a severe mental impairment, and the ALJ assigned great weight to such
20 assessments for being consistent with the record as a whole, given clinical findings within
21 normal limits, along with no history of any psychiatric hospitalizations, suicide attempts, or
22 episodes of mania. (AR 24.) As discussed in detail further herein, the ALJ also evaluated the
23 opinions of examining state physician Dr. Rios, the opinions of non-examining state agency
24 physicians Dr. Jacobs and Dr. Ocrant, and consultative psychological examiner Dr. Hirowawa.

25     A review of the clinical findings cited and evaluated by the ALJ shows the ALJ's
26 findings are supported by substantial evidence in the record. (AR 26, 370-397, 398-414, 465-
27 484, 559, 560, 564.) The Court agrees with Defendant that doctors routinely found no joint pain,
28 no fatigue, and normal memory and concentration. (AR 296, 304, 310, 313, 316, 360, 466-67,

469-70, 472-73, 475-76, 479-80, 482-83, 573, 576.)  While the Court finds merit to Plaintiff's argument that she has demonstrated ongoing fibromyalgia symptoms to her doctors over a period of time (376-77, 473, 508, 512-14, 517, 521), the Court finds the ALJ reasonably determined that while the records supported some limitations, Dr. Sidhu's severe limitations were not adequately supported by objective findings reported in the opinion or exam records preceding the opinion. As discussed in detail further below, the ALJ found inconsistencies between Dr. Sidhu's opinion, the medical opinion of examining state physician Dr. Rios, the opinions of non-examining state agency physicians Dr. Jacobs and Dr. Ocrant, and consultative psychological examiner Dr. Hirowawa, and reasonably resolved the inconsistencies.  The ALJ's analysis of the objective evidence in the record is supported by this review and evaluation of the other opinions.  While Plaintiff does suffer from medical ailments, which the ALJ and agency physicians accepted, the ALJ did not err in giving little weight to the ultimate conclusions of Dr. Sidhu, because "[t]he ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities, Andrews, 53 F.3d at 1039, and the Court defers to the ALJ's rational resolution of conflicting evidence and ambiguities in the record.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

Finally, a physician's opinion of disability that is "premised to a large extent upon the claimant's own accounts of his symptoms and limitations" "may be disregarded where those complaints have been 'properly discounted.' " Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999) (quoting Fair v. Bowen, 885 F.2d 597, 605 (1989)).  This is especially true in the case of fibromyalgia, a disease that "is diagnosed entirely on the basis of patients' reports of pain and other symptoms." See Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004) (fibromyalgia is diagnosed entirely on the basis of a patient's reports of pain and other symptoms and there are no medical tests to confirm the diagnosis).  As discussed below, the ALJ provided a clear and convincing reason to reject Plaintiff's testimony as unreliable, and thus the ALJ's finding that D. Sidhu's opinion was primarily based on subjective complaints was a specific and legitimate reason to assign reduced weight to Dr. Sidhu's opinion.

Accordingly, the Court finds that the ALJ properly gave reduced weight to Dr. Sidhu's opinion because it was based on insufficient objective medical data and relied on plaintiff's subjective complaints.

### 3. The ALJ Erred in Rejecting Dr. Sidhu's Opinion Based on a Conservative Course of Treatment

The ALJ also gave Dr. Sidhu's opinion little weight finding that Plaintiff's course of treatment was conservative. (AR 28.)

Here, Plaintiff argues that she has required emergency room visits due to pain (AR 514), has tried a variety of medications including Cymbalta, Ultram, Norco, Lyrica, Tylenol Number 3, and Neurontin (AR 51), received injections of Toradol and Imitrex in January 2014 (AR 376-77), a Botox injection for headaches in April of 2014, and despite these treatments, continued to suffer ongoing fibromyalgia flares through more recent treatment records (AR 508). (Pl. Br. at 10.) Defendant argues that treating doctors who reviewed pain medication Plaintiff had at home during a hospital visit in 2014 related to ovarian cysts, noted that the pain medication is conservative (AR 573), and also highlight that Plaintiff told Dr. Hirokawa that the pain in her lower extremities was "episodic" and that she never tried trigger point injections for relief (AR 365), and that Dr. Sidhu only listed medications as Plaintiff's treatment, noting only some were helpful, but opining she had a fair prognosis (AR 504). (Def. Opp'n at 16.)

An ALJ may reject the opinion of a treating physician who prescribed conservative treatment, yet opines a claimant suffers disabling conditions. Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir.2001). Here, however, this reason given by the ALJ fails the specific and legitimate standard of review, which requires the ALJ to set out a detailed and thorough summary of the facts and conflicting clinical evidence, state his interpretation, and make findings. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) (citations omitted). The ALJ cannot simply offer a conclusion, but "must set forth his own interpretations and explain why they, rather than the doctors', are correct." (Id.)

The ALJ did not cite to any specific examples of what she considered to be a conservative course of treatment, and only made the conclusory statement that "claimant's"

course of treatment was conservative." (AR 28.) The ALJ only refers to Plaintiff's treatments twice in her opinion. First, in the ALJ's determination that certain of Plaintiff's conditions are not severe impairments (migraines, insomnia, reflux disease, vitamin D deficiency, celiac disease, and right leg injury), the ALJ notes that the Plaintiff "has not required any ongoing treatment or recurrent hospitalizations due to them," and also noted that the "medical records showed she has migraines, but she reported taking medications only on an as needed basis." (AR 23.) Second, as to Plaintiff's asthma, sinusitis, and headaches, the ALJ stated Plaintiff benefited from a sinus surgery, and noted her treatment included inhalers and shots. (AR 26-27.)

Like in Revels, "[t]he ALJ provided no explanation why [s]he deemed this treatment 'conservative' for fibromyalgia." Revels v. Berryhill, 874 F.3d 648, 667 (9th Cir. 2017). The ALJ did not identify any medical opinion which characterized plaintiff's treatment as conservative. An ALJ's lay assessment that a course of treatment was conservative is not a specific or legitimate reason for rejecting the opinions of a treating physician. Aguilar v. Colvin, No. CV 15-977 JC, 2016 WL 1039154, at *5 (C.D. Cal. Mar. 9, 2016); Vallandingham v. Colvin, 2015 WL 1467189, *4 (C.D. Cal. Mar. 26, 2015) ("Because no medical expert characterized [plaintiff's] treatment as conservative . . . the Court cannot find that the ALJ's lay analysis of plaintiff's treatment as conservative was overwhelmingly compelling.") (citations omitted); Tahmas v. Colvin, 2015 WL 3658581, *6 (C.D. Cal. June 11, 2015) ("[T]o the extent that the ALJ was implicitly making a lay determination that plaintiff's treatment was conservative, the Court finds that this also was not a legally sufficient basis to reject plaintiff's subjective symptom testimony because no medical professional characterized plaintiff's treatment as conservative or as incommensurate with plaintiff's subjective symptom complaints.").

Finally, even if the Court were to scour the record for support for the ALJ's conclusory statement, the ALJ's characterization of Plaintiff's course of treatment as "conservative" does not appear to be clearly supported. In Plaintiff's disability report dated October 16, 2013, Plaintiff listed Advair, cetirizine, Singulair, terbutaline, Ventolin, and omeprazole for asthma and allergies. (AR 199.) For migraines, Plaintiff listed apap-butalbital-caffeine, Diazepam, Imitrex

injections, Relpax, and Topamax. (AR 199.) For anxiety she listed Ativan, and Paxil for depression. (AR 199.) In Plaintiff's disability appeal report dated July 14, 2014, Plaintiff listed Dulera and Ventolin for asthma, Fioricet for migraines, Lorazepam for anxiety, Norco for pain, omeprazole for acid reflux, and Ondansetron for nausea. (AR 263.) On a medication list dated March 4, 2016, Plaintiff listed taking Lyrica and Savella for her fibromyalgia, tramadol for pain, Flexeril for a muscle relaxer, Lorazepam for anxiety, omeprazole for stomach acid, and oxybutynin for over active bladder. (AR 280.)

At the hearing Plaintiff testified that the main thing preventing her from working is chronic pain, mostly in the back and neck, which take turns being the worst depending on the day. (AR 45.) Plaintiff stated she previously tried medications including Lyrica, gabapentin, Norco, Nucynta, and many that she doesn't recall. (AR 51.) Of those medications, Norco did help for pain better than her current medications, however she developed an allergy and could not take them any longer. (AR 51-52.) On a not so bad day, Plaintiff's pain is usually around a six or seven on scale of one to ten, and tramadol usually takes the pain down to a five, or a four if a really good day. (AR 52.) On a bad day, Plaintiff's pain is around a level ten, and sometimes medication doesn't help when very bad, but if it helps, takes it down to about a level eight. (AR 52.) She gets massages, and when she has money, sees a chiropractor. (AR 46.) She takes tramadol four times a day, which helps ease back and neck pain just enough where she doesn't "cry," but doesn't help very much. (AR 46.) She takes the muscle relaxer Flexeril once or twice a day, which helps a little bit, but not much. (AR 46.) She has been taking Savella for a few months. (AR 46.) To help with her stress level, Plaintiff takes anti-depressants. (AR 46.) Additionally, as Plaintiff noted in her brief, on August 6, 2015, she visited Dr. Sidhu after a visit to the emergency room the night before where she received injections for pain, nausea, and dizziness. (AR 514.)

Again, "[t]he ALJ provided no explanation why [s]he deemed this treatment 'conservative' for fibromyalgia," Revels v. Berryhill, 874 F.3d 648, 667 (9th Cir. 2017), and the ALJ cannot simply offer a conclusion, but "must set forth his own interpretations and explain why they, rather than the doctors', are correct," Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.

1998).    Accordingly, the ALJ's conclusory statement that Plaintiff has only received a
conservative course of treatment is not a specific, legitimate reason supported by substantial
evidence for rejecting Dr. Sidhu's opinion.    However, the ALJ provided other specific and
legitimate reasons to discount the opinion of Dr. Sidhu, and therefore any such error was
harmless.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008).

4.    The ALJ Properly Gave Dr. Sidhu's Opinion Reduced Weight due to Conflicting Doctors' Opinions in the Record

The ALJ gave Dr. Sidhu's opinion reduced weight because it was "inconsistent with the
other opinions."  (AR 28.)    While the ALJ did not specifically identify the inconsistencies
between Dr. Sidhu's opinion and the other doctor opinions when she stated this finding, the ALJ
evaluated and summarized the opinions of Dr. Rios, Dr. Jacobs, and Dr. Ocrant, prior to
evaluating Dr. Sidhu's opinion and assigning it reduced weight.  (AR 27-28.)

On February 27, 2014, Plaintiff was seen by Dr. Tomas Rios for a comprehensive
internal medicine evaluation.  (AR 364-69.)  Dr. Rios described Plaintiff as well-developed, in
no observable distress, and able to move around the office with ease.  (AR 366.)  Dr. Rios noted
normal station, gait, and a negative Romberg's test.    (AR 367.)    Dr. Rios noted that a
fibromyalgia tender point test did not elicit any pain at the exam, and observed no muscle
guarding or fasciculations.  (AR 368.)    A neurological exam was normal, as well as a motor
strength test. (AR 368.)  Dr. Rios opined that Plaintiff's fibromyalgia appeared clinically stable
on the exam date due to no tender points being elicited, that Plaintiff has a history of asthma but
no evidence of a chronic hypoxic state, and recognized a history of migraines but observed no
significant neurological sequelae.  (AR 368.)  Based on those findings, Dr. Rios recommended
no exertional limitations, and only moderate environmental restrictions, including avoiding
chemicals, dust, fumes and gases due to asthma, and that she should avoid loud environments
due to migraines and history of phonophobia.  (AR 368-69.)

The ALJ gave Dr. Rios' opinion "some weight, but not the most because additional
records at the hearing level showed several tender points," and Plaintiff "had fatigue and pain
from fibromyalgia which supports a medium residual functional capacity."  (AR 27.)

On March 13, 2014, non-examining state agency physician Dr. Jacobs, and on June 10, 2014, non-examining state agency physician Dr. Ocrant, gave opinions regarding Plaintiff's limitations. (AR 72-74, 88-89.) Both doctors found no exertional, manipulative, visual, or communicative limitations. (AR 73-74, 88-89.) Both doctors found no postural limitations aside from opining that Plaintiff could never climb ladders, ropes, or scaffolds due to morbid obesity. (Id.) Both doctors recommended environmental limitations, opining Plaintiff should avoid concentrated exposure to extreme cold and heat, and should avoid even moderate exposure to fumes, odors, dust, and other hazards such as machinery and heights. (Id.)

The ALJ noted these opinions were similar, and gave the two assessments "some weight" because the objective findings showed normal motor strength, reflexes, senses, gait, and ability to ambulate without an assistive device. (AR 27.) However the ALJ also noted that Plaintiff did in fact have tender points, fatigue, and pain from fibromyalgia, which supports limiting Plaintiff to medium work activity, however also stated any additional limitations were not warranted based on the limited findings in the diagnostic studies. (AR 27.)

Plaintiff argues that while the opinions of Dr. Rios, Dr. Jacobs, and Dr. Ocrant conflict with Dr. Sidhu's, merely stating that one opinion is entitled to more weight is not sufficient to reject the opinion, and the ALJ did not provide specific and legitimate reasons for crediting one over the other. (Pl. Br. at 11.) Plaintiff argues that Dr. Rios' opinion opinions was inconsistent with later records, and only based on a single evaluation, which is particularly significant given the fluctuation of fibromyalgia symptoms. (Pl. Br. at 11-12.) Plaintiff argues that Dr. Jacobs and Dr. Ocrant never examined Plaintiff in person and their review of the medical evidence was limited, and therefore their opinions cannot by themselves constitute substantial evidence to reject an examining or treating physician opinion. (Pl. Br. at 12.) Defendant argues that all three doctors opined Plaintiff had no exertional limitations, and the ALJ appropriately gave more weight to such opinions because they were more consistent with the record as whole. (Def. Opp'n at 18-19, citing AR 73, 88-89, 368.)

Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the

treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record. Andrews, 53 F.3d at 1041. The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

Dr. Rios performed a comprehensive internal medicine evaluation of Plaintiff, based on independent clinical findings (AR 364-69.), and such opinion can stand alone as substantial evidence. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that examining physician's "opinion alone constitutes substantial evidence, because it rests on his own independent examination"); Andrews, 53 F.3d at 1041. The ALJ evaluated Dr. Rios' opinion in relation to other evidence in record and only gave it "some weight, but not the most because additional records at the hearing level showed several tender points," and Plaintiff "had fatigue and pain from fibromyalgia which supports a medium residual functional capacity." (AR 27.) Therefore, Plaintiff's argument that Dr. Rios' opinion opinions was inconsistent with later records, and only based on a single evaluation, a significant issue given the fluctuation of fibromyalgia symptoms (Pl. Br. at 11-12), is not convincing in this regard. The ALJ did note the inconsistencies between the medical opinions and records, and reasonably resolved the dispute. "The ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities, Andrews, 53 F.3d at 1039, and the Court thus defers to the ALJ's rational resolution of conflicting evidence and ambiguities in the record. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

The ALJ's decision to give little weight to Dr. Sidhu's opinion is further bolstered by the opinions of the non-examining state agency physicians, Dr. Jacobs and Dr. Ocrant, who, after

reviewing Plaintiff's records, both concluded that there was significant evidence that Plaintiff had very slight limitations. As noted above, the ALJ gave the two assessments "some weight" because the objective findings showed normal motor strength, reflexes, senses, gait, and ability to ambulate without an assistive device, however, also noted that Plaintiff did in fact have tender points, fatigue, and pain from fibromyalgia, which supports limiting Plaintiff to medium work activity, but any additional limitations were not warranted based on the limited findings in the diagnostic studies. (AR 27.) Again, the ALJ noted the inconsistencies between the medical opinions and records, and reasonably resolved the dispute. Andrews, 53 F.3d at 1039; Burch, 400 F.3d at 679.

Therefore, the ALJ properly gave Dr. Sidhu's opinion reduced weight due to the conflicting opinions of Dr. Rios, Dr. Ocrant, and Dr. Jacobs.

5.    The ALJ Erred in Assigning Reduced Weight to Dr. Sidhu's Opinion for being Inconsistent with Plaintiff's Reported Daily Activities

The ALJ found that Dr. Sidhu's opinion was "inconsistent with the claimant's reported activities of daily living which demonstrated a far greater residual functional capacity." (AR 28.)

Plaintiff argues the ALJ failed to recognize Plaintiff's daily activities are dependent on her level of pain, highlighting that her testimony demonstrated, for example, that she can only walk a few blocks on a bad day, versus a mile on a good day (AR 47), stays in bed on bad days (AR 48), prepares meals only on good days (AR 54, 242), and finishes chores on good days that were left uncompleted on bad days (AR 48). (Pl. Br. at 13.) Defendant argues that the activities that Plaintiff admitted she was able to do are inconsistent with Dr. Sidhu's opined limitations that she could not focus more than two hours a day, could not use her hands 90% of the day, and could not use her arms 75% of the day, and cite to Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001), where the Ninth Circuit upheld an ALJ's rejection of a treating doctor's opinion because "the restrictions appear[ed] to be inconsistent with the level of activity that [the claimant] engaged in by maintaining a household and raising two young children."[3]

---

[3] The Court notes that the quote continues: "with no significant assistance from her ex husband." Rollins, 261 F.3d at 856.

The ALJ concluded the physical limitations that Dr. Sidhu identified conflicted with Plaintiff's level of activity, however, the ALJ did not specifically address which activities conflict with which opined limitations, and review of the limitations fails to show a conflict with the activities Plaintiff identified. For example, Plaintiff's statements regarding her ability to walk do not clearly conflict with any limitation identified by Dr. Sidhu, who did not opine any limitations on the distance or time Plaintiff is able to walk, and only noted that she would require a job that permits shifting between sitting, standing, and walking, and that she would need ten-minute walks every thirty minutes. (AR 504-506.) Plaintiff testified that on a bad day, she can only walk a few blocks, and probably a mile on a not so bad day, however if she does walk a lot one day, she will be in bed the next day. (AR 47.) She walks to a home church for bible study once a week which is located five houses away. (AR 42.) Because Plaintiff's reported walking did not exceed any limitations identified by Dr. Sidhu, this evidence does not support the ALJ's conclusion. (AR 28, 504-506.)

Further, Plaintiff's ability to perform limited household chores and to provide help to her children does not evidence a level of activity that exceeds the limitations identified by Dr. Sidhu. Plaintiff testified she is lucky to have one or two good days a week where she is really able to do anything at all, and often on bad days she just doesn't do anything or sleeps all day. (AR 47.) On a good day, Plaintiff gets up at 6:00 a.m. to wake her kids up for school, and then goes back to bed until 7:00 a.m., then drives her daughter to school, then returns to take the rest of the children to school, then she usually goes back to bed until about 9:00 or 10:00 a.m. (AR 47.) She then works on chores that she hasn't had a chance to do in a long time. (AR 47.) She will do dishes if her husband left any, but he usually does them, and may do her own laundry, but not others, as each family member does their own laundry. (AR 48.) She will do things such as taking care of the cats, or cleaning up, but she doesn't "do much around the house." (AR 48.)

As for driving, Plaintiff has a driver's license, but if her husband is home, she doesn't really drive at all. (AR 42.) If he is not home, she usually just drives her kids to school and back, and if she goes grocery shopping, it is only a mile away. (AR 42.) She does not take the kids to activities, as they really don't have activities outside of the home. (AR 42.) If she needs

to go to the grocery store, she usually takes friend with her to help with anything too heavy or to help push the cart if needed, because she knows that it will hurt her back, so she avoids doing so. (AR 48.) Upon returning from the grocery store, she unloads the items, and then, depending on how long she was gone, will just sit and watch a lot of television. (AR 48.)

The ALJ fails to explain how these limited activities conflict with limitations identified by Dr. Sidhu. The Court cannot speculate as to which limitations the ALJ rejected as conflicting with Plaintiff's daily activities.[4] Moreover, a claimant's ability to perform limited household chores alone is not a specific and legitimate reason to reject a physician's opinion where such activities do not appear to conflict with the opined limitations. See Ghanim v. Colvin, 763 F.3d 1154, 1162-63 (9th Cir. 2014) (holding an ALJ erred in rejecting physicians' opinions where the claimant's "limited daily activities," including "some basic chores," were "not in tension with the opinions of his treating providers").

In light of the ALJ's failure to identify evidence regarding Plaintiff's level of activity that clearly conflicts with or exceeds the limitations identified by Dr. Sidhu, this factor does not support the ALJ's decision to give less weight to the opinion of Dr. Sidhu. However, the ALJ provided other specific and legitimate reasons to discount the opinion of Dr. Sidhu, and therefore any such error was harmless. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008).

      6.    The ALJ Properly Assigned Reduced Weight to Dr. Sidhu's Opinion for being Inconsistent with the Consultative Psychological Examiner's Data

The ALJ found that "Dr. Sidhu's opinion relative to the claimant's limited ability to use her brain is inapposite to the clinical data gathered by the consultative psychological examiner who noted that she presented with normal concentration, full orientation, average intelligence, normal memory, no hallucinations, or delusions, and no suicidal ideations. (AR 28.)

On February 25, 2014, Dr. Greg Hirokawa performed a comprehensive psychiatric

---

[4] If the Court were to speculate, the most extreme limitation would appear to be Dr. Sidhu's opinion that Plaintiff would be limited to only 10% use of bilateral hands and fingers during a workday. (AR 504-506.) However, none of Plaintiff's activities on even a good day appear on their face to exceed this limitation, and the ALJ did not identify any specific activities that conflict with any specific opined limitations. (AR 28.)

evaluation of Plaintiff. (AR 356-62.) Dr. Hirokawa generally observed that Plaintiff drove to the appointment on time, presented in a pleasant manner, made fair eye contact, facial expressions were appropriate, gross motor function was normal, grooming and attire was appropriate for conditions, she interacted normally with the examiner and office staff, and exhibited no bizarre behavior. (AR 358.) Plaintiff reported depression, anxiety, poor sleep, mood swings, withdrawal, loss of interest, and anger problems. (AR 358.) Plaintiff reported her depression and anxiety stemmed from a dysfunctional childhood, PTSD from abusive ex-husband, and reported her condition got worse due to her physical health problems. (AR 358.)

Dr. Hirokawa opined that Plaintiff's symptoms of depression were primarily due to her medical problems and associated limitations, that her overall communication skills were fair, and that the likelihood of Plaintiff's mental condition improving within 12 months was fair, with Plaintiff demonstrating a positive work history consisting of extended jobs for five years. (AR 361.) Dr. Hirokawa found that Plaintiff demonstrated only mild impairment, defined as "some mild limitations, but individual can generally function well," in the following categories: 1) ability to follow simple instructions; 2) ability to follow complex instructions; 3) ability to maintain adequate pace/persistence to perform both simple and complex tasks; 4) ability to maintain adequate attention/concentration; 5) ability to adapt to changes in job routine; 6) ability to interact appropriately with co-workers, supervisors, and the public on regular basis; 7) ability to accept instructions from supervisor and respond appropriately to criticism; 8) social judgment and awareness of appropriate behavior; and 9) ability to function independently and sustain an ordinary routine without special supervision. (AR 361.) Dr. Hirokawa also found Plaintiff demonstrated moderate impairment, defined as a "moderate limitation in this area, but the individual is still able to function satisfactorily, in the following categories: 1) ability to withstand the stress of routine workday; and 2) likelihood of emotionally deteriorating in a work environment. (AR 361.) He also opined Plaintiff is able to manage her monetary funds. (AR 361.)

Here, Plaintiff argues that treatment notes show Plaintiff presented with anxiety, depression, stress, and insomnia (AR 469-70, 472), and that Plaintiff testified that she

experiences brain fog after twenty or thirty minutes of working on something such as paying bills (AR 49), but neither Plaintiff nor Dr. Sidhu indicated she constantly experiences brain fog, and so it was improper to reject based on such diagnosis by the consultative examiner. (Pl. Br. at 13.) Plaintiff thus contends the ALJ failed to give a proper explanation of why a one-time examiner's opinion could warrant rejecting Dr. Sidhu's opinion, given that the ALJ should look at the longitudinal record in cases of fibromyalgia. (Pl. Br. at 13-14.) Defendant's position is that Dr. Hirokawa's opinion is in direct conflict with Dr. Sidhu's opinion that Plaintiff would be off task 25% or more of the workday, with chronic fatigue and constant pain, and that the opinion is more consistent with the overall longitudinal medical record beginning in 2012. (Def. Opp'n at 15.)

Dr. Hirokawa performed a comprehensive psychiatric evaluation of Plaintiff, based on independent clinical findings (AR 356-62.), and such opinion can stand alone as substantial evidence. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that examining physician's "opinion alone constitutes substantial evidence, because it rests on his own independent examination"); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (opinion of nontreating source based on independent clinical findings may itself be substantial evidence).

Additionally, aside from being based on independent clinical findings, the Court agrees with Defendant that Dr. Hirokawa's opinion is supported by other evidence in the record, including clinical data from Plaintiff's treating doctor largely finding normal neurological and psychiatric findings (AR 467, 470[5], 473, 476, 480, 483), and Plaintiff repeatedly denying fatigue (AR 303, 309, 315, 469, 491-92). "The ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities." Andrews, 53 F.3d at 1039.

Therefore, the Court finds that because Dr. Hirokawa's opinion was based on an independent examination of Plaintiff , and because the findings of that examination were consistent with the objective evidence in the record, Dr. Hirokawa's opinion constitutes

---

[5] The Court notes that this record does show that on April 22, 2014, Dr. Sidhu found "[m]ild tenderness in several tender points 11/18 throughout the body." (AR 470.)

1  substantial evidence supporting the ALJ's decision.

2      7.    The ALJ Provided Specific and Legitimate Reasons to Assign Reduced Weight to
3             Dr. Sidhu's Opinion

4          In sum, while the Court found some of the ALJ's reasons to be error, such error was

5  harmless, and the ALJ provided sufficient specific and legitimate reasons supported by

6  substantial evidence to discount Dr. Sidhu's opinion.[6]  While plaintiff undoubtedly suffers from

7  a variety of conditions, the ALJ properly weighed the conflicting evidence and ultimately found,

8  based on substantial evidence in the record as a whole, that such limitations were not present at a

9  disabling level.  The Court thus defers to the ALJ's rational resolution of conflicting evidence

10  and ambiguities in the record.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where

11  evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that

12  must be upheld.").

13      **B.    The ALJ's Adverse Credibility Determinations**

14          The ALJ opined that the medical evidence in the record does not support the extent of

15  Plaintiff's subjective complaints because of inconsistent and unsupported statements.  (AR 28-

16  29.)   The ALJ found Plaintiff's subjective complaints about her condition to be "partially

17  consistent, but not to the extent alleged," as Plaintiff "reported that she gets dizzy in showers;

18  however, she is able to drive alone."  (AR 28.)  The ALJ opined that Plaintiff's statements

19  regarding the reason she stopped working, weakened her credibility, as Plaintiff "reported being

20  fired from her last place of employment for talking back, as well as problems with being late and

21  fighting."  (AR 28.)  The ALJ also found Plaintiff's reported activities of daily living to be

22

23  _____
[6] For the first time in a footnote in her reply brief, Plaintiff mentions that 20 C.F.R. 404.1520C(c)(3) requires
   consideration of certain factors in evaluating a treating physician's opinion.  (Pl.'s Reply Supp. Opening Br. ("Pl.
24  Reply") 2, ECF No. 23.)  Plaintiff did not cite to this regulation in her opening brief, and in her reply brief, does not
   appear make any direct argument that the ALJ erred by failing to consider these factors.  She simply cites to the
25  regulation in response to Defendant's opposition brief wherein Defendant argued Social Security Ruling 96-2p had
   been rescinded for applications filed after March 27, 2017, thus eliminating the controlling weight rule for treating
26  physicians, and Plaintiff simply clarified that the regulations still require an ALJ to consider a treating physician's
   familiarity with the patient.  (Pl. Reply at 2.)  Even  if Plaintiff's reply brief could be construed as raising an
27  argument that the ALJ failed to consider these factors, which it does not appear to do, Plaintiff has waived any such
   challenge by failing to raise the argument in her opening brief.  Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d
28  1001, 1007 (9th Cir. 2006); Lynch Guzman v. Astrue, 365 F. App'x 869, 871 n.1 (9th Cir. 2010) (citing Harger v.
   DOL, 569 F.3d 898, 904 n.9 (9th Cir. 2009)).

inconsistent with a disabled person.  Specifically, the ALJ noted Plaintiff's testimony that she lived with her husband and four children, that she drives a vehicle, "is independent in activities of daily living," that she "cooks, does laundry, gets her children up, dresses, and drives her children to school in addition to cleaning up after four cats," and watches television most of the day.  (AR 28.)

Plaintiff challenges the ALJ's credibility determinations and the Court addresses each of these reasons in turn.

1.    The Legal Standard Applicable to the ALJ's Credibility Determinations

The parties agree that here, the ALJ must have provided clear and convincing reasons to discredit Plaintiff's testimony regarding her disability limitations.[7]

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Then, "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so."  Brown-Hunter v. Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015).  "The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not

---

[7] The Court notes that while the Defendant disagrees with the Ninth Circuit's precedent requiring clear and convincing reasons in this regard, Defendant accepts it is the applicable standard in this circuit.  (Def. Opp'n at 17-18.)

arbitrarily discredit the claimant's testimony." Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284). The district court is constrained to review those reasons that the ALJ provided in finding the claimant's testimony not credible. Brown-Hunter, 806 F.3d at 492.

> 2. The ALJ Erred in Rejecting Plaintiff's Testimony based on her Statements Regarding Dizziness while Showering and Ability to Drive

The ALJ found Plaintiff's subjective complaints about her condition to be "partially consistent, but not to the extent alleged," as Plaintiff "reported that she gets dizzy in showers; however, she is able to drive alone." (AR 28.)

Plaintiff argues that the "ALJ's speculation that if Clausen gets dizzy in the shower she should be unable to drive lacks any foundation," the ALJ did not ask about this inconsistency at the hearing, and the record does not specify "whether showering versus driving triggers Clausen's dizziness," and cannot be a proper basis for rejecting the testimony without additional information. (Pl. Br. at 18-19.) Defendant counters that "[w]hile this may not be a direct contradiction, it is a reasonable point [b]ecause Plaintiff alleges the simple act of bathing is so difficult she cannot do it, one would reasonably expect the motion of a car to be even more troublesome." (Def. Opp'n at 23.)

It is difficult to see how the ALJ could properly discount Plaintiff's testimony solely on

the fact that she drives occasionally, yet reports getting dizzy in the shower. Without further explanation provided by the ALJ as to why dizziness while standing in a confined shower is inconsistent with the ability to drive a car while seated, the Court finds this is not a clear and convincing reason to reject Plaintiff's testimony. Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002) ("The clear and convincing standard is the most demanding required in Social Security cases").

3. The ALJ Did Not Err in Discrediting Plaintiff's Testimony about the Reason for Leaving Prior Occupation

The ALJ opined that Plaintiff's statements regarding the reason she stopped working, weakened her credibility, as Plaintiff "reported being fired from her last place of employment for talking back, as well as problems with being late and fighting." (AR 28.)

Plaintiff argues that while she reported being fired from her previous job for talking back, being late, and fighting (AR 28, 359), the report also shows that Plaintiff cited anxiety as a reason she was let go from the position. (Pl. Br. at 19.) Plaintiff contends that given anxiety is a symptom of fibromyalgia, it is error for the ALJ to reject her symptom testimony based on the reason she initially stopped working. (Pl. Br. at 19.) Defendant counters that the ALJ appropriately relied on the fact that Plaintiff left her prior position for reasons other than a disability. (Def. Opp'n at 23-24, citing Drouin v. Sullivan, 966 F.2d 1255, 1256 (9th Cir. 1992) (pain testimony properly rejected because claimant was laid off from work for reasons unrelated to her pain). Defendant argues that despite Plaintiff arguing in her brief that anxiety was also listed as a reason for leaving the job, at the hearing, Plaintiff highlighted a primary reason for leaving the position was that the employer allegedly forced her to falsify documents. (Def. Opp'n at 24, citing AR 41.)

An ALJ may consider why a claimant left her last place of employment when making a credibility determination. See Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001), as amended (Nov. 9, 2001) (finding the ALJ could properly discount the claimant's pain testimony as the claimant left his job because he was laid off, rather than because he was injured). However, making a credibility determination based on a claimant's reason for leaving her job

calls for a fact-specific review. See Shehan v. Astrue, No. EDCV 08-01302(MLG), 2009 WL 2524573, at *3 (C.D. Cal. Aug. 17, 2009) (comparing the facts in Bruton to determine whether an adverse credibility determination based on claimant's reason for leaving her job was proper); Lake v. Berryhill, No. 316CV03021GPCJMA, 2018 WL 1466407, at *12 (S.D. Cal. Mar. 26, 2018) (same).

The ALJ cites to the examination records from Dr. Hirokawa which note that Plaintiff was fired from her last employment "for talking back, as well as problems with being late and fighting." (AR 28, citing AR 359.) The full exam notation reads:

> She worked as a receptionist, EMT, CAN[.] She reported her longest position held was working for EMT for 5 years. She reported being fired due to a [sic] talking back, anxiety. She described the relationship with her coworkers as fair. She reported problems at work with being late, being absent, fighting. She reported she looked online and EDD for over one year. She reported she last worked January 2012. She reported she stopped due to getting fired.

(AR 359.)

Plaintiff's position where she was employed as an EMT for five years was during the years of 2003 and 2008, whereas her last position as an EMT that ended in January of 2012 was only held for less than one year. (AR 90.) Therefore, the notation that she was fired for talking back and anxiety appears to apply to the EMT position held between 2003 and 2008, however it reasonably may apply to multiple positions, given the style of notes taken by Dr. Hirokawa in describing her general reasons for difficulty in keeping multiple jobs, or the reasons may reasonably be interpreted as referring to the last job she was fired from. (AR 90, 359.)

In the application for disability benefits dated October 3, 2013, Plaintiff stated "I lost my last job due to severe anxiety and being unable to perform job duties." (AR 163.) In the disability report dated October 16, 2013, Plaintiff stated the reason she stopped working was because of her condition. (AR 196.)

Her husband's third-party function report states that on one hand, she gets along well with bosses and other authority figures, however on the next question confirms she has been fired because of problems getting along with other people, referring to a position at Springville Inn. (AR 232.) In her own function report, Plaintiff states she "always [] had trouble with

bosses, got fired a lot," and states she has been fired from Sierra Valley Rehab and Springville Inn because she tends to lash out when she has anxiety, and notes that you "can't tell off your boss and keep your job." (AR 246.)

At the hearing before the ALJ, the Plaintiff stated the doctor took her off work because her "anxiety and stuff was overwhelming . . . was a lot of stuff going on at work and that was the last time [she] worked." (AR 41.) When asked what was happening that was so stressful and causing anxiety, Plaintiff stated there was a lot of corruption at the tribal reservation that she wasn't okay with going along with, and specifically, she wasn't willing to falsify documents, which led to her to allegedly being held by the police with pressure to falsify the documents, and she did not return to the position. (AR 41.)

Upon review of the records, the ALJ made a reasonable determination that Plaintiff left her last place of employment for reasons not due to disability. Although the evidence may be interpreted in a light more favorable to Plaintiff, the ALJ's interpretation is rational and "[w]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." Burch v. Barnhart, 400 F.3d 676, 680–81 (quoting Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989)). Therefore, the Court finds that Plaintiff's reason for leaving her previous employment, as evaluated by the ALJ, is a clear and convincing reason supported by substantial evidence for an adverse credibility finding.

4.     The ALJ Erred in Rejecting Plaintiff's Testimony Based on Daily Activities

The ALJ found Plaintiff's reported activities of daily living to be inconsistent with those of a disabled person, specifically noting testimony that she lived with her husband and four children, that she drives a vehicle, "is independent in activities of daily living," that she "cooks, does laundry, gets her children up, dresses, and drives her children to school in addition to cleaning up after four cats," in addition to watching television most of the day. (AR 28.)

Here, Plaintiff emphasized that the Ninth Circuit directs ALJs to be cautious when finding activities are inconsistent with an alleged level of limitation because "impairments that would unquestionably preclude work and all the pressures of workplace environment will often be consistent with doing more than merely resting in bed all day," Garrison v. Colvin, 759 F.3d

995, 1016 (9th Cir. 2014) (citations omitted), and an individual does not need to "utterly incapacitated in order to be disabled," Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001). (Pl. Br. at 19-20.) Plaintiff again highlights the waxing and waning of fibromyalgia symptoms, arguing that the ALJ did not properly consider that Plaintiff's activity level depends on the amount of pain she is suffering on that particular day. (Pl. Br. at 20.) Defendant responds that the Commissioner is not "arguing these activities prove Plaintiff can work, but rather that the ALJ was correct to note these activities are inconsistent with Plaintiff's extreme allegations." (Def. Opp'n at 25, citing Molina, 674 F.3d at 1113 ("Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment").)

The ALJ may consider the claimant's daily activities in making a credibility determination. See Diedrich v. Berryhill, 874 F.3d 634, 642-43 (9th Cir. 2017); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); 20 C.F.R. § 404.1529(c)(3)(i) (claimant's daily activities are relevant to evaluating symptoms). However, "[o]ne does not need to be 'utterly incapacitated' in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)). In fact, "many home activities are not easily transferable to what may be the more grueling environment of the workplace." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). Only if a claimant's level of activities is inconsistent with her claimed limitations would activities of daily living have any bearing on the claimant's credibility. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).

There are two ways an ALJ may use daily activities for an adverse credibility finding. Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007). First, daily activities can form the basis of an adverse credibility determination if the claimant's activity contradicts the claimant's testimony. Id. Second, "daily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.' " Id. (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)). The ALJ must make specific findings as to the daily activities and their transferability to conclude that the claimant's daily activities warrant an adverse credibility

determination.  Orn, 495 F.3d at 639.

In this instance, first, the ALJ failed to identify how Plaintiff's daily activities contradict her other testimony.  Id.  The ALJ's opinion does not identify any functional limitations that Plaintiff is alleging which are inconsistent with the activities identified.  Rather, the ALJ only made the conclusory statement that her activities are "inconsistent with a disabled person."  (AR 28.)  "[T]he mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability."  Orn, 495 F.3d at 639 (quoting Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)).

Second, the ALJ did not establish that Plaintiff's daily activities are transferable to a work setting.  To the extent that the ALJ was discrediting Plaintiff's credibility because her daily activities meet the threshold for transferable work skills, the ALJ did not explain how Plaintiff was able to spend a substantial part of her day engaged in pursuits involving the performance of functions that are transferable to a work setting.  See Orn, 495 F.3d at 639; Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).  The Court finds that Plaintiff's activities are not clearly and readily "transferrable to a work environment."  See Diedrich, 874 F.3d at 643 (holding house chores, cooking, self-grooming, paying bills, writing checks, and caring for a cat, as well as shopping outside the home, are not similar to typical work responsibilities).  Even if such activities would be transferable to a certain employment, the ALJ failed to explain how they would transfer, and failed to address the fact that Plaintiff repeatedly claimed that her ability to do any activities depends on the severity of her symptoms on a good day versus a bad day, and that she requires rest following such activities (AR 46-48, 51-52, 54, 242).  See Fair v. Bowen, 885 F.2d at 603 (opining that it might be impossible to take periodic rests in the work environment); Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014) (finding the ALJ mischaracterized claimant's testimony that emphasized in performing many daily tasks, she was heavily assisted by her mother and is regularly prohibited by her pain from engaging in activities).

Therefore, the Court finds that Plaintiff's daily activity, as set forth by the ALJ, is not a clear and convincing reason supported by substantial evidence for an adverse credibility finding.

5. <u>The ALJ Provided a Clear and Convincing Reason to Find Plaintiff's Testimony Not Credible</u>

Although two of the reasons provided by the ALJ to discredit Plaintiff's testimony are not clear and convincing reasons supported by substantial evidence, any such error is harmless as the ALJ's evaluation of Plaintiff's reason for leaving her former employment was a proper basis for the adverse credibility finding. <u>See</u> <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1162 (9th Cir. 2008). Accordingly, the Court finds that the ALJ provided a clear and convincing reason for the adverse credibility finding.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ properly evaluated the opinion of Dr. Sidhu, properly evaluated Plaintiff's credibility, and the ALJ's decision was supported by substantial evidence. Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Lisa Leanne Clausen. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: __**February 8, 2019**__                    _____

UNITED STATES MAGISTRATE JUDGE